*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCPW-22-0000078
14-JUN-2022
09:08 AM
Dkt. 81 OPD

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

WILLIAM M. HICKS; RALPH BOYEA; MADGE SCHAEFER; MICHAELA IKEUCHI; KIMEONA KANE; MAKI MORINOUE; ROBERTA MAYOR; DEBORAH WARD; JENNIFER LIENHART-TSUJI; LARRY S. VERAY; and PHILIP BARNES,
Petitioners,

vs.

THE 2021 HAWAIʻI REAPPORTIONMENT COMMISSION AND ITS MEMBERS; THE STATE OF HAWAIʻI OFFICE OF ELECTIONS; and SCOTT NAGO, in his official capacity as Chief Elections Officer, State of Hawaiʻi,
Respondents.

SCPW-22-0000078

ORIGINAL PROCEEDING

JUNE 14, 2022

DISSENTING OPINION OF WILSON, J.

## I. Introduction

I join Justice McKenna's concurring and dissenting opinion. I dissent separately to contextualize how the Majority's opinion fails to protect the people of Hawaii's fundamental right to vote.

In the wake of the 2020 census and the resulting 2022 reapportionment maps being drawn across the country,

numerous claims of unconstitutional maps are being brought by groups of concerned citizens in sister states.[1]  The majority of cases feature complaints of unconstitutional partisan gerrymandering and racial discrimination.[2]  The United States Supreme Court has specifically foreclosed the federal courts as a venue for adjudicating claims of political gerrymandering, the specter of which has been raised by the Petitioners in the instant case.  See Rucho v. Common Cause, 139 S.Ct. 2484, 2506 (2019).

State courts are the only venue for citizens to bring complaints against this particular kind of attack on the power of their vote, which impairs the fundamental right upon which it stands.  By this case, the people of Hawai'i—through a diverse group of concerned citizens, united in their quest to secure constitutionally compliant legislative and state senate

---

[1]    According to the Brennan Center for Justice:

> As of June 8, 2022, a total of 72 cases have been filed challenging congressional and legislative maps in 26 states as racially discriminatory and/or partisan gerrymanders.  Litigation has resulted in orders from state courts to redraw legislative and/or congressional maps in Alaska, Florida, Maryland, New York, North Carolina, and Ohio in time for the 2022 election cycle (the Florida redraw has since been put on hold by an appellate court).  In addition, South Carolina has agreed to amend its new state house map without a court order, but that revised map will not take effect until 2024.  A total of 45 cases remain pending at either the trial or appellate levels.

*Brennan Center for Justice*, Redistricting Litigation Roundup (June 8, 2022), https://www.brennancenter.org/our-work/research-reports/redistricting-litigation-roundup-0 [https://perma.cc/EZ2H-SAEJ].

[2]    Id.

district maps—have sounded this alarm of encroachment upon their right to vote, and the Majority has failed to heed their profound call for protection of this right upon which all others depend.

Petitioners assert that the 2021 Reapportionment Commission ("Commission") produced maps that fail to comply with criterion six of article IV, section 6 of the Constitution of the State of Hawaiʻi ("Hawaiʻi Constitution"), which provides: "Where practicable, representative districts shall be wholly included within senatorial districts."  Haw. Const. art. IV, § 6.

This criterion, along with all enumerated criteria in article IV, section 6, is specifically designed to guard against "gerrymandering or other unfair or partial result" in the apportionment plan.  Supp. Stand. Comm. Rep. No. 58, in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1968, at 265 (1973).

Respectfully, the Majority endorses an unconstitutional redistricting process that undermines the right to vote in Hawaiʻi.

## II.  Discussion

### A.   The Constitutional Right to Vote

#### 1.   The People's Government and the Enumerated Right

The Hawaiʻi Constitution begins with "We, the people of Hawaiʻi[.]"  Haw. Const. pmbl.  It then sets forth the

principle that "[a]ll political power of this State is inherent in the people" and that "the responsibility for the exercise thereof rests with the people.  All government is founded on this authority."  Haw. Const. art. I, § 1.

Our Nation was founded on this very principle—that "Governments . . . deriv[e] their just powers from the consent of the governed[.]"  The Declaration of Independence para. 2 (U.S. 1776).  The phrase "no taxation without representation" was the rallying cry for American revolutionaries, and many gave their lives pursuing the ideals embodied by it.  This slogan encapsulated the American colonists' resentment towards having taxes levied upon them by a distant British Parliament that lacked American—elected legislators who represented the interests of the colonists.

A burning desire for elected, accountable representation was the driving force behind our nation's birth.  The "power," James Madison wrote, "is in the people over the Government, and not in the Government over the people."  4 Annals of Cong. 934 (1794).  Thus, a government "of the people, by the people, for the people" was born. Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863).

Elections are the means by which this government "of the people, by the people, for the people" is effectuated.  As such, "[t]he right to vote is of fundamental importance." Green Party of Hawaii v. Nago, 138 Hawai'i 228, 240, 378 P.3d 944, 956 (2016) (citing Hayes v. Gill, 52 Haw. 251, 269, 473

4

P.2d 872, 883 (1970)).  The Hawaiʻi Constitution enshrines the right to vote in article I, section 8 ("No citizen shall be disfranchised, or deprived of any right or privileges secured to other citizens, unless by the law of the land") and article II, section 1 ("Every citizen of the United States who shall have attained the age of eighteen years, have been a resident of this State not less than one year next preceding the election and be a voter registered as provided by law, shall be qualified to vote in any state or local election[]") as well as through the adoption of the United States Constitution, and its protections of the same.[3]  Yet, constitutional protection of the right to vote was not a foregone conclusion; today's protections are the fruits of momentous struggle against discriminatory voting practices, including gerrymandered redistricting.

2.    **Historic Struggles to Secure the Right to Vote**

Let us not forget that until the ratification of the fifteenth amendment of the United States Constitution in 1870[4]

---

[3]     Article fifteen of the United States Constitution, ratified in 1870, gave African American men the right to vote; article nineteen, ratified in 1920, gave American women the right to vote; article fourteen, ratified in 1964, eliminated poll taxes; and article sixteen, ratified in 1971, lowered the voting age for all elections to age eighteen years.

[4]     U.S. Const. art. XV, § 1 provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

and the nineteenth amendment in 1920,[5] citizens of the United States could be denied the right to vote on the basis of their race and/or gender. Even with these amendments in place, African Americans, women, and other historically excluded groups were prevented from registering to vote through abuses of the voter registration process, including literacy tests, violence, threats of violence, and economic coercion.[6] The poll tax and whites-only primaries further limited minority participation in the electoral process.[7]

In 1957, Dr. Martin Luther King Jr. delivered his "Give Us the Ballot" address on the steps of the Lincoln Memorial. His speech laid bare the empty promise of constitutional amendments and desegregation case law that languished without structured processes and methods to make the franchise real:

> [A]ll types of conniving methods are still being used to prevent Negroes from becoming registered voters. The denial of this sacred right is a tragic betrayal of the highest mandates of our democratic tradition. And so our most urgent request to the president of the United States and every member of Congress is to give us the right to vote.

Rev. Martin Luther King, Jr., "Give Us the Ballot—We Will Transform the South," (May 17, 1957) (emphases added).

---

[5] U.S. Const. art. XIX provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of sex. Congress shall have power to enforce this article by appropriate legislation."

[6] Dep't of Just. Manual Resource, Title 8 Civil Rights: VOTING RIGHTS ACT OF 1965--HISTORY AND OVERVIEW §19 (4th ed. 2022-3)

[7] Id.

The Voting Rights Act of 1965 finally delivered on the promise of the fifteenth and nineteenth amendments by creating structures and procedures specifically designed to give them effect.

### 3. The Voting Rights Act of 1965 – Procedurally Securing the Right to Vote

The Voting Rights Act of 1965 was enacted to end the whites—only electoral system followed by much of the South, as the remedies provided by earlier civil rights acts (in 1957, 1960, and 1964) and the organizing work of the civil rights movement had been unable to open the franchise to African Americans in many areas. See Dep't of Just. Manual Resource, Title 8 Civil Rights: Voting Rights Act of 1965—History and Overview §19 (4th ed. 2022-3). It was not until President Lyndon Baines Johnson signed the Voting Rights Act of 1965 that specific laws, remedies, methods and procedures were implemented to realize the promise of the fifteenth and nineteenth amendments:

> The Voting Rights Act banned the use of literacy tests (Section 4), authorized federal registration of voters where local registrars had refused voter registration to African Americans (Section 6), authorized the appointment of federal observers to monitor polling place activities on election day to assure that the newly enfranchised African Americans would be permitted to vote and that their votes would be counted (Section 8), and allowed new laws affecting voting to be implemented only if they were proven not to have a discriminatory purpose or effect (Section 5). By means of a formula set out in the Act, these special provisions applied (initially for a five-year period) to areas with a record of discrimination (Section 4), while general anti-discrimination provisions applied to the nation as a whole.

Id. (cleaned up)

7

This legislation, and all the affirmative mechanics it puts into place to realize the right to vote, illustrate the fragility of the right itself—that despite constitutional protections granting the right to vote, the strength of the right is only as viable as the methods and procedures giving it effect. Apportionment is a core process of protection, and any claims of a failure of the apportionment process to give effect to the constitutional protections of the right to vote must be analyzed against the backdrop of these historical struggles to make the right to vote <u>real</u>. The district—within—district criteria is specifically equipped to prevent gerrymandering,[8] and failure to give it effect opens the door to dilution of the right to vote.

**B.    The Specter of Gerrymandering and Vote Dilution**

**1.    Gerrymandered Districts Dilute Voting Strength**

The right to vote is of fundamental importance. <u>Green Party</u>, 138 Hawai'i at 240, 378 P.3d at 956. "No right is more precious in a free country than that of having a voice in the election of those who make laws; other rights, even the

---

[8]    <u>See</u> Sophia Caldera, Daryl DeFord, Moon Duchin, Samuel C. Gutekunst & Cara Nix, <u>Mathematics of Nested Districts: The Case of Alaska</u>, Statistics and Public Policy, 7:1, 39-51 (2020) <u>available at</u> https://mggg.org/uploads/Alaska.pdf (last visited June 7, 2022) ("From the perspective of redistricting, nesting means that the composition of one house of the legislature <u>massively constrains the space of possible districting plans for the other, arguably cutting down the latitude for gerrymandering</u>.") (emphasis added).

most basic, are illusory if the right to vote is undermined."
Wesberry v. Sanders, 376 U.S. 1, 17 (1964).

Any attempt to dilute the power of a vote erodes the fundamental right standing behind the vote itself. Reynolds v. Sims, 377 U.S. 533 (1964) ("the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.")

A gerrymandered redistricting plan dilutes voting strength. It is such an effective vote-dilution device that Section 2 and Section 5 of the Voting Rights Act[9] prohibit the use of any voting practices or procedures, including redistricting plans, that dilute minority voting strength.[10] In the instant case, Petitioners allege the record reflects that Hawai'i's constitutional criteria designed to prevent gerrymandered districts have been discarded in favor of illegitimate reapportionment factors, the consequences of which would be likely to benefit incumbents.

Petitioners make clear the grave consequences of such a gerrymandered redistricting process, and the responsibility of this court to prevent it:

---

[9] 42 U.S.C. § 1973.

[10] While the Petitioners do not raise a claim under the Voting Rights Act nor allege a specific dilution of minority voting strength, the criteria in article IV section 6 are specifically designed to prevent gerrymandering (alongside other unjust outcomes), and the dilutive effect of a gerrymandered reapportionment process impacts each resulting vote.

> [L]egislators who benefit from specific maps have little to no electoral incentive to appoint commissioners who will objectively apply the constitutional criteria, if doing so could jeopardize their chances of re-election.  In turn, <u>gerrymandered communities will not be able to vote out such legislators, as their voting power would be diluted through the reapportionment process</u>."  In other words, <u>it is this Court's responsibility to ensure that the Commission follows the reapportionment criteria, so that it is the people who "choose their representatives, not the other way around.</u>

(emphases added).

### 2.    **Illegitimate Reapportionment Factors in the Record**

Petitioners have shown that the Commission failed to give effect to criterion six because of a preference for preserving "historic districts that have existed for decades."[11]  In addition, the record reflects that despite the practicability of following the district-within-district criteria in this year's maps, the Commission opted not to

---

[11]    Petitioners argue in their petition:

> This "preference" for preserving historic districts, which was also offered as an explanation for not complying with the district within district requirements, is not supported by the relevant constitutional and statutory provisions, and would be likely to benefit incumbents.  The drawing of boundaries to the advantage of individuals or political parties is explicitly prohibited by Article IV, Section 6, and this requirement, which is mandatory, applies to incumbents as a group as well.
>
> Instead, it would appear that this "preference" was deemed by the Commission to be more important than the district within district requirements and consequently, the Commission was compelled to make dramatic changes to house districts due to population changes, but did not adjust senate districts accordingly, in an apparent effort to keep senate district lines the same.  Chair Mugiishi admitted as much when he stated: "Again, changing the senate map would be massively disruptive, right?  Because, as you know, there are much fewer senators.  So if you're going to start to change the senate map, the whole island of O'ahu will explode."  This is precisely the type of gerrymandering, unfair, and partial result that the constitutional and statutory criteria was intended to avoid.

because "[C]hanging the senate map would be massively disruptive, right?  Because, as you know, there are much fewer senators.  So if you're going to start to change the senate map, the whole island of O'ahu will explode."

These justifications for choosing to preserve state senate districts—that they have "existed for decades" and that to make changes would "be massively disruptive"—are inapposite in view of the constitutional criteria, and are brazen in their consequential effect to protect the status quo.  As the record is devoid of any legitimate considerations for failing to give effect to criterion six, this posture of preserving the state senate status quo translates into protecting incumbent state senators.  This potentiality strikes at the heart of the founders' specific concerns about "gerrymandering, unfair, and partial results"—the precise outcomes Constitution's article IV section 6 criteria are designed to prevent.

The likelihood that gerrymandering is behind the failure to give criterion six effect is heightened by the staggering percentage of state senate districts that fail to comply with the district—within—district criteria, which—at 64.7%—is an extreme deviation in view of the Hicks plan, which has demonstrated compliance is practicable.[12]

---

[12]     Majority Opinion at 3.

11

3.    **The Commission's Constitutional Obligation to Protect the Right to Vote**

The Constitution protects the right to vote.  Haw. Const. art. I, § 8; art. II, § 1.  The right to vote is exercised during elections.  Various methods and procedures are required to structure and facilitate elections and ensure fair elections.  Such methods and procedures affect a person's ability to exercise the right to vote.  See Green Party, 138 Hawai'i at 241, 378 P.3d at 957 (finding that "the method used for calculating the number of sufficient ballots required for an election affects a person's ability to exercise the right to vote.").  Flawed election methods and procedures "may result in the deprivation of the right to vote[.]"  See id. at 240, 378 P.3d at 956.  It is axiomatic that the constitutional right to vote must be protected by any constitutionally designed method or procedure essential for structuring and facilitating elections.

Reapportionment is one such procedure.  Article IV of the Hawai'i Constitution sets forth and governs reapportionment.  Article IV, section 2 provides for a reapportionment process that creates a commission of nine members who "shall act by majority vote of its membership and shall establish its own procedures, except as may be provided by law."  Haw. Const. art. IV, § 2.  (emphasis added).

Under article IV, the commission must act in accordance with the apportionment obligations set forth in

12

sections 2 through 9.  This includes Article IV, section 6, which provides that the commission, in carrying out its apportionment and redistricting duties, "shall be guided by" eight enumerated criteria; four are mandatory in all circumstances and four, including the "district within district" provision, are mandatory to be applied whenever "practicable."  See McKenna Concur and Dissent at 2.

An apportionment commission's failure to perform its duties and/or generate a constitutionally sound reapportionment plan is subject to this court's original jurisdiction, whereby the court "may compel, by mandamus or otherwise, the appropriate person or persons to perform their duty or to correct any error made in a reapportionment plan, or it may take such other action to effectuate the purposes of this section as it may deem appropriate."  Haw. Const. art. IV, § 10.

Given the constitutional obligations imposed on the Commission to carry out its duties set forth under article IV section 6, and in full view of the constitutionally protected right to vote, the Commission must be understood to be constitutionally obligated to protect the right to vote in every aspect of carrying out its mandate.

The Majority incorrectly holds that "[t]he Commission must *consider* the district within district guidelines when redrawing district lines.  But it is not required to give them any particular effect in redistricting."

13

Respectfully, such a holding is fundamentally at odds with the constitutional mandate that, if practicable, senate districts must contain congressional districts.

I join Justice McKenna's analysis that in view of settled principles of constitutional interpretation, article IV, section 6 is self-executing, and that "[p]ursuant to article XVI, section 16, the Commission was duty-bound to effectuate the criteria to 'the fullest extent that their respective natures permit.'" McKenna Concur and Dissent at 18.

"The language of article IV, section 6 is not ambiguous: criteria four, five, six and eight <u>must</u> be applied where 'practicable.'" <u>Id.</u> (emphasis added). Article IV, section 6 provides that the Commission <u>shall</u> be guided by the criteria contained therein. Criterion six provides "[w]here practicable, representative districts <u>shall</u> be wholly included within senatorial districts." (emphasis added). The word "shall" in both article IV, section 6 and criterion six creates an imperative command. <u>See</u> McKenna Dissent at 18. Further—"[i]t is well-established that, where a statute contains the word "shall," the provision generally will be construed as mandatory." <u>Malahoff v. Saito</u>, 111 Hawai'i 168, 191, 140 P.3d 401, 424 (2006) (citations omitted).

The Hicks plan demonstrated it was "practicable" for representative districts to be wholly included within

14

senatorial districts, therefore the Commission was mandated to give criterion six effect.

The Commission's failure to give effect to criterion six amounts to a failure to fulfil its constitutional obligations set forth under article IV, section 6. As discussed herein, criterion six is specifically equipped to prevent gerrymandering, which is a scourge on the electoral process that dilutes the power of a vote. Any attempt to dilute the power of a vote erodes the fundamental right standing behind the vote itself. Reynolds, 377 U.S. at 554-55. Therefore, the Commission's failure to give effect to criterion six in the execution of its duties is a failure of its constitutional obligation to protect the right to vote.

**C.    Alaska, Maryland, and North Carolina: Courts finding maps unconstitutional political gerrymanders, as demonstrated by measurable deviations from constitutional criteria**

**1.    Alaska**

In February 2022 the Alaska Supreme Court found that the Alaska Redistricting Board's 2021 plan featured an unconstitutional political gerrymander, and remanded to the board for further proceedings to correct the unconstitutional plan. See In the Matter of the 2021 Alaska Redistricting Cases, No. S-18332 (Alaska, Mar. 25, 2022).

Notably, Alaska's constitution mandates the "district—within—district" or "nesting" criteria; state legislative districts must be nested, so that one Senate district is composed of two-House districts. Alaska Const.

art. VI, § 6.  Four petitions filed by Alaskan voters and municipalities (consolidated) challenged the 2021 Alaska Redistricting Board's plan on the basis that the pairing of two particular house districts—House District 21 (South Muldoon) and House District 22 (Eagle River Valley) into one state senate district (Senate District K) violated the constitution as a political gerrymander.  Specifically, the plaintiffs argued before the trial court[13] that without any legitimate purpose, the pairing "dilutes the voting power of the Muldoon voters."  In the Matter of the 2021 Redistricting Plan, No. 3AN-21-08869CI (Feb.15, 2022).  In finding for the plaintiffs, the Alaska Supreme Court affirmed the trial court's conclusion that Senate District K was in fact a political gerrymander.  It is important to note that the trial court, in its findings of fact and conclusions of law, measured deviations in increments as small as tenths of a percentage point as part of its analysis finding the pairing unconstitutional.

In examining the pairing, part of the trial court's analysis looked at whether the pairing was justified as a means for increasing representation for both districts (by way of reducing the overall representational deviation of both districts).  The court examined the deviations as follows:

---

[13] The consolidated cases were heard by Superior Court Judge Thomas Matthews of the third judicial district at Anchorage.

Turning to proportionality, Eagle River Valley and North Eagle River/Chugiak are both underrepresented by -1.65% and -0.71 % respectively. South Muldoon is underrepresented by -1.70%. Pairing Eagle River Valley with South Muldoon creates an average deviation of -1.68%, whereas pairing both Eagle River districts creates an average deviation of -1.18%. Thus, the Board's choice to pair Eagle River Valley with South Muldoon does not lead to more proportional representation.

In the Matter of the 2021 Redistricting Plan, No. 3AN-21-08869CI (Feb.15, 2022) at 70-71.

Here, the Alaska courts draw constitutionally based conclusions by comparing right—to—vote deviations in amounts as small as tenths of a percentage point. The Alaska courts do so as part of their analysis in determining whether a particular district-within-district pairing is an unconstitutional political gerrymander. This concern for and close analysis of deviation percentage points in a constitutional gerrymander/right-to-vote case is instructive. Both the -1.68 deviation and the -1.18% deviation are presumed constitutional as they fall well under the 10% threshold for proportionality analysis. That both deviations are still so closely examined for the purposes of deciding which deviation would best protect the right to vote stands in stark contrast from the instant case before our Court, where a 64.7% deviation from a constitutionally required criteria—specifically equipped to guard against gerrymandering—has been allowed to stand.

2. **Maryland**

The State of Maryland presents another instance where 2021 maps have been found unconstitutional on the basis of political gerrymandering. On March 25, 2022, the trial

court struck down Maryland's new congressional map, finding that the map "is an 'outlier,' an extreme gerrymander that subordinates constitutional criteria to political considerations." See Szeliga v. Lamone, No. C-02-CV-21-001816 (Mar. 25, 2022) and Parrott v. Lamone, No. C-02-CV-21-001773 (Mar. 25, 2022). Underlying that finding, according to the court, is the map's "substantial deviation from 'compactness' as well as [its] failure to give 'due regard' to 'the boundaries of political subdivisions' as required by [the Maryland Constitution][.]" Id.

Part of the court's analysis focused on expert testimony with regards to deviations from the 'compactness' criteria as evident by examining model maps. The court's findings of fact notably cite just a 4.4% difference as evidence sufficient to support its finding of a "substantial deviation from 'compactness'":

> With respect to the first set of maps drawn with very little regard to compactness but regard given to contiguity and equal population, 14,000 of the maps have seven districts that were won by President Joseph Biden and only 4.4% have eight districts won by President Joseph Biden. Mr. Trende concluded that "it is exceedingly unlikely that if you were drawing by chance, you would end up with map where President Joe Biden carried all eight districts."

> With respect to the application of compactness and contiguity as well as equal population, he concluded that the 2021 Plan would result in eight districts won by President Biden, which he concluded was "an extremely improbable outcome if you really were drawing just caring about traditional redistricting criteria and weren't subordinating those considerations for partisanship."

Id. at 63-64. (emphases added).

Here, Maryland's court is flagging a 4.4% chance of a particular outcome as clear evidence of a deviation from the

constitutionally required redistricting criteria of 'compactness.' Put another way, 95.6% of model maps in this case show a different outcome if you control for partisanship. The court rightfully characterizes this outcome as an "extreme gerrymander" that is a "substantial deviation" from constitutionally required criteria.

In the instant case, our 64.7% deviation from criterion six is far more akin to Maryland's unconstitutional maps—an "extreme" example of a "substantial deviation" that absent a justifiable rationale, only increases the likelihood that gerrymandering is in play.

### 3. North Carolina

On February 4, 2022, North Carolina's Supreme Court also struck down new congressional and legislative maps, finding they were a partisan gerrymander in violation of the North Carolina Constitution's free elections clause, the equal protection clause, the free speech clause, and the freedom of assembly clause. Harper v. Hall, 867 S.E.2d 554, 558 (N.C. 2022). Because of pressing timing issues, the court struck down the maps via order, with an opinion to follow. Id. The order affirmed the trial court's findings that "the General Assembly diminished and diluted the voting power of voters affiliated with one party on the basis of party affiliation." Id. at 557. (emphasis added). Pending an opinion, the order is still instructive as it sets forth the following categories of quantifiable data from which deviations from constitutional

right—to—vote protections may be measured, including unconstitutional partisan gerrymanders: "There are multiple reliable ways of demonstrating the existence of an unconstitutional partisan gerrymander. In particular, mean-median difference analysis, efficiency gap analysis, close-votes, close seats analysis, and partisan symmetry analysis may be useful in assessing whether the mapmaker adhered to traditional neutral districting criteria . . ." Id.

In view of Alaska, Maryland and North Carolina courts close analysis of the deviations from constitutionally required reapportionment criteria, the 64.7% deviation from criterion six in this instant case is extreme, especially as evidenced by the Hicks and Boyea Plans' demonstration of the practicality of compliance.

**4.  An Extreme Deviation at 64.7%**

Population deviation cases may be instructive in assessing just how extreme the 64.7% deviation is in the instant case. For purposes of determining whether a plan complies with the requirement that "the average number of permanent residents per member in each district [be] as nearly equal to the average for the basic island unit as practicable," deviations of more than 10 percent from the

20

target population base are treated as constitutionally suspect.[14]

This 10% threshold for population deviation analysis is, at its core, a specific protection of the "one-person, one vote" doctrine—the right-to-vote doctrine designed to ensure that "the vote of any citizen is approximately equal in weight to that of any other citizen in the State." Reynolds, 377 U.S. at 579. Applying the 10% population deviation framework to the instant case, this court faced a prima facie discriminatory plan that far exceeded 10.01%. As the record fails to justify the Commission's deviation from criterion six, the 64.7% deviation—in full view of the demonstrated practicability of near 100% compliance—can only be understood as a glaring constitutional violation.

Further, while this case primarily concerns the Commission's failure to give effect to criterion six, it is important to note that a number of the Petitioners expressed concern that the 2021 reapportionment plan also failed to avoid submergence in a number of districts. The term "submergence" refers to the pernicious phenomenon whereby "one

---

[14] See Haw. Const. art IV, § 6; cf. Citizens for Equitable & Responsible Gov't v. Cty. of Hawai'i, 108 Haw. 318, 336, 120 P.3d 217, 225 (2005), amended (Sept. 22, 2005) (In a case involving county districts, not legislative districts, "an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the [s]tate." (citations omitted)).

socio-economic group [is] disadvantaged by reason of its placement in a district in which another socio-economic class heavily predominates." Supp. Stand. Comm. Rep. No. 58, in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1968, at 246 (1973). Petitioners raised specific concerns that impoverished rural communities were submerged with wealthier coastal areas, and that the rural and agricultural communities were unnecessarily submerged with urban areas and vice versa.[15]

Criterion eight of article IV, section 6 is designed to guard against this type of reapportionment outcome, and provides that "[w]here practicable, submergence of an area in a larger district wherein substantially different

---

[15] See also discussion infra Part II.E.2-12, wherein Petitioners set forth concerns about the following specific instances of submergence:

> Petitioner Michaela Ikeuchi has deep concerns about the submergence of Native Hawaiian and poorer rural communities with wealthier coastal areas on the Kona coast; Petitioner Kimeona Kane is concerned that the 2021 Final Legislative Reapportionment Plan squeezes Waimānalo between Hawaiʻi Kai and Kailua in the senate district, submerging his rural community into wealthier and more politically connected neighborhoods; Petitioner Deborah Ward is concerned that the plan would submerge rural communities on the island of Hawaiʻi into urban communities with vastly different environmental and socio-economic interests; and Petitioner Philip Barnes strongly believes that rural and agricultural areas, which historically have been submerged to Hilo and Kailua-Kona-centric political interests, should finally have adequate representation in the Legislature, so that they can receive much needed government support to achieve the unfulfilled promise of food sustainability in Hawaiʻi.

socio-economic interests predominate shall be avoided." While it can be factually determined that the Commission produced an unacceptable 64.7% deviation from the "districts—within—districts" criteria, deviations from criterion eight are more difficult to quantify. Unlike criterion six, which can objectively be measured, criterion eight "is, admittedly, not a precise criterion, but it does delineate an undesirable condition which should be considered in selecting districts." Supp. Stand. Comm. Rep. No. 58, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 246 (1973).

Here, the Petitioners recognize that the Commission at least discussed "non-submergence" at the October 14, 2022 meeting, but highlight the Commission's failure "to disclose with whom the technical committee [permitted interaction group] had communicated, what type of community outreach it had done, any fact findings supporting deviation from the constitutional and statutorily required standards, or details about what considerations the committee may have given more weight and why." While criterion eight recognizes that some degree of submergence may be unavoidable in a reapportionment process, the Commission here failed to provide <u>any</u> compelling evidence that <u>any</u> submergence was necessary in the 2021 reapportionment plan. Even if the Commission had put forth such justification, it would be subject to careful and meticulous review for any unconstitutional impairment on the right to vote.

The record here reflects an extreme 64.7% deviation from criterion six, and an unexplained deviation from criterion eight. Alaska, Maryland and North Carolina provide instructive examples of how analysis of deviations from constitutional criteria can lead to the discovery—and rejection of—unconstitutionally gerrymandered maps. The deviations in the instant case, in light of the demonstrated practicability of compliance with criterion six, further demonstrate that the Commission failed in its obligation to protect the right to vote in the execution of its duties.

**D.  The Hicks and Boyea Plans Demonstrate the Practicability of Compliance**

Petitioners Hicks and Boyea submitted two plans to the Commission for consideration:  a senate map for Oʻahu submitted on January 16, 2022 (the "Hicks Plan") and a house map for the Island of Hawaiʻi submitted on January 19, 2022 (the "Boyea Plan").  The Hicks Plan took the Commission's last proposed house map for Oʻahu as a starting point and then created senate districts simply by joining two house districts together.  The Boyea Plan took the Commission's last proposed senate map for the Island of Hawaiʻi and then drew lines to divide each senate district into two roughly equally populated house districts while trying to keep communities together. The plans showed that including exactly two-house districts within each senate district was not only practicable, but it was straightforward.  Put differently, both the Hicks Plan and

24

the Boyea Plan demonstrate it is both possible, and practicable, to have 100% compliance with criterion six. Further—both the Hicks and Boyea plans created maps with lower overall population deviations than the deviations in the technical committee plans.[16] The hard work undertaken by Hicks and Boyea in drawing maps to demonstrate the practicability of compliance with criterion six illustrates the lengths to which they and their fellow Petitioners had to—and were willing to— go to protect the right to vote for themselves and their fellow citizens.

**E.     The Petitioners as Guardians of the Right to Vote**

**1.     Engaged Citizens Sound the Alarm**

The Petitioners in the instant case are registered voters—engaged citizens from a spectrum of racial, socioeconomic, geographic, and professional backgrounds, all of whom sought an honest ear from the Commission. In addition to their stalwart efforts to bring the instant case, most of these citizens were actively engaged in the 2021 reapportionment and redistricting process for their islands, and contributed heroic amounts of personal time and effort attending hearings, drafting and submitting written and oral testimony, and even preparing their own reapportionment

---

[16]     Petitioner Hicks' congressional map is able to fit 25 house districts into Congressional District 1 and 26 house districts into Congressional District 2 while keeping the overall deviation under one percent.

plans.[17]  Six Petitioners are from the island of Hawai'i, four are from the island of O'ahu, and one Petitioner is from the island of Maui.  Their individual and collective contributions, as well as their concerns about the 2021 reapportionment process, are material to understanding the continuing need for citizens to stand guard over the right to vote here in Hawai'i.

### 2.  Petitioner William M. Hicks

Petitioner William M. Hicks is a retired Navy Captain with a combined 48 years of service across active duty in the U.S. Navy and as the civilian Director or Deputy Director of Submarine Operations at COMSUBPAC.[18]  Hicks attended and testified at ten reapportionment commission meetings and four public hearing meetings totaling over 27 hours in meeting attendance alone.  Notably, this tally does not account for the quantum of time and effort Hicks poured into (1) preparing his own reapportionment plans, which have

---

[17]     The 2021 Reapportionment Commission held nineteen meetings from April 13, 2021 – March 7, 2022.  Additionally, the 2021 Reapportionment Commission held eleven Public Hearings across the islands from November 20, 2021 – December 10, 2021. Written summaries of these commission meetings and public hearings containing details regarding attendees, public testimony and meeting length, can be accessed at: https://elections.hawaii.gov/about-us/boards-and-commissions/reapportionment/[https://perma.cc/RCA2-4HX5]. Last accessed May 26, 2022.

All references in this section to Petitioner meeting attendance and public testimony are drawn from these records.

[18]     COMSUBPAC is the acronym for Commander, Submarine Force, U.S. Pacific Fleet, which is the principal advisor to the Commander, United States Pacific Fleet for submarine matters.

demonstrated the practicability of adhering to criterion six, and (2) attending and leading Kailua Neighborhood Board meetings, so as to inform his community about this impending injustice, and sharing the solutions he crafted to mitigate it.

Hicks lives in Kailua on O'ahu, and in the 2011 reapportionment was assigned to House District 51 and Senate District 25. Hicks was deeply concerned that failing to comply with criterion six would make it less likely that elected officials will have a shared understanding of their community's needs, which in turn would complicate legislative coordination, and frustrate neighbors' efforts to effectively advocate for their common interests to the legislature.

### 3. Petitioner Ralph Boyea

Petitioner Ralph Boyea retired as the Hawai'i Division Chief of the Hawai'i Government Employees Association. Boyea attended and testified at eight reapportionment commission meetings and two public hearing meetings totaling over eighteen hours in meeting attendance. Like Hicks, Boyea invested laudable time and energy drafting and submitting his own redistrict maps for the reapportionment commission's review, and sharing his work with fellow citizens across the island of Hawai'i. Boyea, a resident in Puna on the Island of Hawai'i, has been assigned to House District 51 and Senate District 25 since the 2011 reapportionment. Boyea's proposed

27

maps, unlike the final 2021 reapportionment maps, complied with criterion six, and successfully avoided (1) submerging rural communities like his own into urban areas, and (2) crossing senate lines.

### 4. Petitioner Kimeona Kane

Petitioner Kimeona Kane ("Kane"), the director for community outreach at a local environmental non-profit and Chair of the Waimānalo Neighborhood Board, was born and raised on a dairy farm in the Waikupanaha area of Waimānalo on the island of Oʻahu. Kane, assigned to House District 51 and Senate District 25 since registering to vote in 2018, attended and testified at eleven reapportionment commission meetings and one public hearing meeting totaling over 26 hours in meeting attendance. Kane's involvement in the 2021 reapportionment process arose from his efforts to ensure that Waimānalo and Native Hawaiians are properly and effectively represented at the legislature and in government, and his grave concerns that gentrification will displace generations of Waimānalo residents, and submergence will erode their political power.

### 5. Petitioner Roberta Mayor

Petitioner Roberta Mayor ("Mayor"), a retired educator and the Hawaiʻi Kai Neighborhood Board Chair, served as a teacher, principal and superintendent in Hawaiʻi and California for forty-one years. Mayor, who was born and raised in Hawaiʻi, has been registered to vote in Hawaiʻi since

28

returning in 2009, and has been assigned to House District 17 and Senate District 25 since the 2011 reapportionment. Mayor's involvement in this process was driven by the outcome of the 2011 reapportionment, which divided Hawaiʻi Kai into two house districts and two senate districts, which, in turn, spanned three separate house districts each. This result left Hawaiʻi Kai without a plurality of representation in either senate district. Hoping to avoid this scenario for another ten years, Mayor attended and testified at seven reapportionment commission meetings and two public hearing meetings totaling almost eighteen hours in attendance. Notably, this amount of time does not include the hours and efforts Mayor has spent preparing her testimony, informing her community members and neighborhood board about the unconstitutional 2021 reapportionment maps, and mobilizing them to take official action rejecting them.

**6.    Petitioner Maki Morinoue**

Petitioner Maki Morinoue ("Morinoue") is an artist, small business manager, and a fourth generation (Yonsei) Japanese-American from the Hōlualoa village on the island of Hawaiʻi. Under the 2011 reapportionment, she was assigned to House District 6 and Senate District 3. Morinoue attended and testified at four reapportionment commission meetings and one public hearing meeting totaling approximately 6 hours in attendance. Morinoue became involved due to her particular concerns about preserving the agricultural character, water

29

rights, and history of Hōlualoa as a village of farmers and paniolos, and part of the breadbasket of Hawai'i. Like many of her fellow Petitioners, Morinoue is also gravely concerned about the effect of submergence, specifically as it would undermine the quality of representation at the legislature for rural and agricultural areas.

### 7. Petitioner Larry S. Veray

Petitioner Larry S. Veray ("Veray") is a retired Navy Command Master Chief with a combined 52 years of both active duty in the United States Navy and as a Scientific Engineering Technical Advisor assigned to the United States Indo-Pacific Command. Veray has lived in Hawai'i for the past thirty four years in the Waiau area of Pearl City, and for the last seventeen years has volunteered with the Pearl City Neighborhood Board, of which he is the current Chair. Veray was greatly concerned that his community, as a result of the Commission's failure to give effect to criterion six, would be divided into four house and four senate districts, and have to contend with eight legislators, none of whom would necessarily come from Pearl City or make Veray's neighborhood their priority.

Veray attended and testified at four reapportionment commission meetings and one public hearing meeting for a total of over seven hours in attendance. Like his fellow Petitioners, Veray also committed untold hours and energy towards preparing testimony, and informing and mobilizing his

30

neighborhood board about the injustices at play and the consequences at stake. Notably, Veray observed that he offered to discuss potential solutions with the Commission's technical committee, but was never contacted by anyone associated with the technical committee.

### 8. Petitioner Philip Barnes

Petitioner Philip Barnes ("Barnes") is a retired teacher who has lived in Hawai'i since 1998, and in Hilo for the past ten years. Barnes, driven by his concern that the 2021 reapportionment plan would submerge his urban neighborhood's interests with those of the more rural interests of the Hāmākua coast, made his voice heard at the reapportionment's public hearing on December 2, 2021. It was Barnes' strong belief that rural and agricultural areas have historically been submerged to Hilo and Kailua—Kona—centric political interests, and that the 2021 reapportionment process should finally provide them with adequate representation in the legislature.

### 9. Petitioner Jennifer Lienhart-Tsuji

Petitioner Jennifer Lienhart-Tsuji ("Lienhart-Tsuji") moved to Hawai'i in 1995, and lives in Waikōloa Village on the Island of Hawai'i. A practicing social worker, Lienhart-Tsuji is particularly attuned to the lack of resources available to communities outside the urban centers of the island, and has serious concerns regarding the island's overcrowded schools and inadequate public infrastructure,

31

especially in the face of an anticipated influx of new residents and children.  Lienhart-Tsuji joined the petition armed with concerns regarding the Commission's lack of transparency and accountability to the public, and her understanding that the 2021 reapportionment plan unnecessarily splits Waikōloa Village into two house districts, thereby diminishing its representation in the legislature.

### 10.  **Petitioner Deborah Ward**

Petitioner Deborah Ward ("Ward") is a retired University of Hawai'i extension educator and professor, a farmer of produce and ornamental plants, and recent chair of the Hawai'i Island Group of the Sierra Club of Hawai'i. Ward has lived in Hawai'i for fifty-five years, including 40 years in Kurtistown on the island of Hawai'i.  She was assigned to House District 3 and Senate District 2 under the 2011 reapportionment plan.  As with many of her fellow Petitioners, Ward is concerned about the socio-economic challenges of her community, including houselessness, food insecurity, and lack of social services.  To that end, Ward volunteered her time preparing for, attending and testifying at a reapportionment commission meeting and a public hearing meeting, where she voiced her concern that the final 2021 reapportionment plan would submerge rural communities on the island of Hawai'i into urban communities with vastly different environmental and socio-economic interests.

### 11. Petitioner Michaela Ikeuchi

Petitioner Michaela Ikeuchi ("Ikeuchi"), a marketing manager, was born and raised on the Island of Hawai'i, and is assigned to House District 5 and Senate District 3. As a Hawaiian and a Keauhou resident, Ikeuchi has deep concerns about the 2021 final reapportionment plan, and the submergence of Native Hawaiian and poorer rural communities with wealthier coastal areas on the Kona coast. Specifically, Ikeuchi wants her representatives to focus on increasing access to social services in underserved areas, ocean conservation, and water use issues, particularly in light of how overdevelopment and drought have led to sewage spills and water use restrictions in her community. Like many of her fellow Petitioners, Ikeuchi also has concerns about the Commission's lack of transparency and accountability to the community and feels a responsibility to future generations to remedy that.

### 12. Petitioner Madge Schaefer

Petitioner Madge Schaefer ("Shaefer") permanently moved to Hawai'i twenty-five years ago after retiring from a career in politics in California. She now lives in Kihei on the island of Maui, and since moving to Hawai'i she has been registered to vote and has not missed an election. In the 2011 reapportionment, Schaefer was assigned to House District 11 and Senate District 6. Schaefer is concerned that the 2021 final legislative reapportionment plan does not include Maui's house districts wholly within senate districts, as the 2011

33

reapportionment plan did.  Schaefer is concerned that this discrepancy is not in the best interest of her community, as legislation needs to pass both houses of the legislature, but under the new plan, the interests of her senator and house member will be, like the lines in their districts, misaligned.

Together, these guardians rose, united, and spoke out as they watched a straight-forward constitutional protection of their most fundamental right—the right to vote—erode before them.   Not only did they speak out—not only did they sound the alarm through their complaint to this court that the Commission failed to produce constitutionally compliant maps, but they went further: they demonstrated—through their own efforts, using the Commission's own data—that it was in fact practicable to give effect to Criteria six.  The Hicks and Boyea plans unequivocally prove that the Commission's deviation in the face of this criteria—64.7%—is unconstitutional.  And with the record devoid of any rationale in support of this deviation, indefensibly so.

### III.  Conclusion

For the reasons above, I respectfully dissent.  The 2021 Reapportionment Maps failed to comply with the constitutional requirements specifically designed to protect the right to vote from the pernicious effects of gerrymandered apportionment.

As a result, for the next 10 years, Petitioners will suffer the unconstitutional dilution of their voting strength.

34

I join Justice McKenna's ardent hope that future reapportionment commissions will give effect to the intent of the people of Hawai'i as expressed by the language of article IV, section 6 of the Hawai'i Constitution.  The resolute dedication of Petitioners is a historic demonstration of the necessity of citizens to remain vigilant in protecting their right to vote, and to hold all branches of government to account for any failure to deliver the constitutional promise of an effective right to the franchise. The failure of this court to heed their plea for protection of the right to vote should not hamper those in the future who stand guard over our most important guarantee of freedom.

/s/ Michael D. Wilson